HANS PEDERSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
MARIE PEDERSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12328, 12329. Promulgated January 9, 1929.

1090

*Edwin H. Flick, Esq.,* for the petitioners.

*Warren F. Wattles, Esq.,* and *Earl W. Shinn, Esq.,* for the respondent.

1092

1102

1108

OPINION.

MILLIKEN: We will discuss the issues raised in the order in which they are set forth in our findings of fact.

I. It was conceded by both parties at the hearing, and it is conceded in the briefs filed in behalf of them respectively, that petitioner made income in the amount of $96,630.50; that this income was derived from the so-called French contract; and that the only question with reference to such income which is submitted to the Board for decision is whether it should be included in petitioner's gross income for the calendar year 1921, where respondent has placed it, or in his gross income for the calendar year 1918, when petitioner asserts it was received. Since, as will later appear in this opinion, the Board has no jurisdiction to redetermine the tax for the latter year, and since the amount of income received by petitioner in that year can, as will appear, in no way affect the tax liability for the years over which the Board has jurisdiction, to wit, 1920 and 1921, we will confine ourselves to the question of whether this income is taxable in the year 1921.

The facts as found show that of the initial payment made by the French Republic under its contract with Pichot, the sum of $209,-420.30, was deposited on April 2, 1918, to petitioner's credit in the Scandinavian American Bank. Against this deposit petitioner drew checks amounting to $4,000, and these checks were honored but at a time not shown. On April 20, 1918, the Republic of France instituted its suit in which it sought the cancellation of its contract and the recovery of its initial payment from Pichot, the bank, the National Surety Co. and the petitioner. On April 24, 1918, or four days after the institution of the suit, petitioner drew and delivered to the bank his check for $200,000, in payment of indebtedness owing by him to the bank. About this time it appears that in some way not shown this money disappeared from petitioner's account and the payment of the check was withheld. The money again appears in petitioner's bank pass book as of May 27, 1919, and this time in the amount of $205,420.30, this being the amount of the original deposit, less the checks totaling $4,000 above referred to. On the same day on which the sum of $205,420.30 appeared in petitioner's pass book the check for $200,000 was cashed by the bank. It further appears that in the final settlement between petitioner and the bank, made after the entry of the judgment in the French suit, the bank credited petitioner with interest on the $200,000 represented by the check of

April 24, 1918, for the period during which payment of the check had been withheld. The final judgment in so far as it affected petitioner was to the effect that the Republic of France recover of the Scandinavian American Bank the sum of $105,420.30 " received by the Scandinavian American Bank from the defendant, Hans Pederson, out of the moneys paid by the plaintiff to defendant Robert Pichot, and turned over by said Robert Pichot to said Pederson and deposited by him in said bank; and that not one of the defendants herein is entitled to any part of said sum of $105,420.30 ". The matter was then finally settled between petitioner and the bank by the bank giving him credit for interest on the $200,000 check during the period which its payment had been withheld, and credit for other items, whereupon petitioner executed to the bank his note for the balance. It is thus clear that the sum of $205,420.30 was in the bank to the credit of petitioner from May 27, 1919; that the remainder of the initial deposit had on that date been paid on checks of petitioner; and, lastly, and this is significant, that petitioner was credited with interest on the sum of $200,000 represented by the check of April 24, 1918, for the period during which its payment was denied. It is inconceivable that interest was paid by the bank to petitioner on money deposited which should not have been properly credited to him.

Respondent contends that the matter should be treated as though petitioner had been compelled to sue for the breach of his contract and had received no part of the gain sought to be taxed until the end of his suit. In support of this contention respondent cites authorities (13 C. J. 644; 6 R. C. L. 982; *Butterfield* v. *Byron*, 153 Mass. 517; 27 N. E. 667) to the effect that it is a general rule of law that one who has contracted to do a particular thing and has received payment in advance therefor, can not retain such payment where by reason of unavoidable accident he is excused from performance; and, further, that where performance of a contract, lawful in its inception, becomes unlawful by reason of subsequent events, the contract is terminated in so far as it remains executory, and both parties are excused from further performance, citing *United States* v. *Dietrich*, 126 Fed. 671. From these authorities counsel for respondent reaches the conclusion that petitioner " became liable to the Republic of France for the return of all moneys advanced to him under the contract." From this counsel for respondent argues that the case is the same as though petitioner had received nothing until the termination of the action brought by the Republic of France. Before discussing these contentions, it is pertinent to point out that it is further held in the *Dietrich* case that such subsequent events do not extinguish any rights acquired by either party before

the contract became unlawful or by its breach. A similar rule is laid down in the *Butterfield* case.

We should determine the tax liability of petitioner on the basis of what actually has occurred rather than on the basis of what ought to have occurred. *Anna M. Harkness*, 1 B. T. A. 127; *R. V. Board*, 14 B. T. A. 374. We have found, and both parties agree on this point, that petitioner was in receipt of income from the French contract in the amount of $96,630.50. This disposes of the question of petitioner's rights under the contract. Under this state of facts we can perceive no reason which required petitioner to return to the Republic of France what he originally received, at least to the extent of the amount he was allowed by the final judgment to retain. Petitioner was in absolute possession of this latter amount from May 27, 1919, and it is a very pertinent fact that he was credited with interest on the amount represented by the check of April 24, 1918, for the period that it remained unpaid. Petitioner did not bring the suit. The suit was brought against him. He asserted his right to the whole amount. It was the Republic of France that partially prevailed in the action but with the result that petitioner was left in undisturbed possession of a sufficient amount of the original deposit to include taxable income to the extent of $96,630.50. Looking to what actually occurred, we find that petitioner was in possession and claiming the ownership of this sum long prior to the taxable year 1921, and that the final judgment confirmed his right thereto. Under these circumstances we are compelled to hold that respondent erred in including this income in petitioner's gross income for the year 1921. Cf. *R. V. Board, supra.*

II. Petitioner asserts that from the sum of $15,000 received by him from the Highway Department of the State of Washington he paid or caused to be paid amounts which total $8,000 to George W. Allen, in consideration of the latter's services in securing the payment of the above sum. In support of his claim, petitioner introduced in evidence three checks signed by him, all dated January 12, 1921, and all drawn on the Scandinavian American Bank. Two of these checks, one for $500 and one for $1,000, were drawn in favor of " Geo. W. Allen & Co." and one for $500 was drawn in favor of " Geo. W. Allen ". On direct examination petitioner testified that on April 1, 1921, he endorsed the certificate of deposit of March 28, 1921, to the bank and that from the total of said deposit the bank deducted the sum of $6,000 for the account of Allen and only the remainder of $8,000 was placed to his credit. Petitioner introduced in evidence the note teller's blotter of the bank for April 1, 1921, and this discloses that on that date petitioner deposited the sum of $15,000 and that of this amount the sum of $6,000 was used to pay

a loan to " Geo. W. Allen," identified by the number 74037. It is claimed by petitioner that the total amount of $8,000 which he first and last paid Allen was represented by the three checks above referred to and the credit given by the bank to Allen.

Petitioner placed George W. Allen on the stand, and instead of supporting petitioner's claim he denied that he had received anything in consideration for his services. He stated that the three checks represented amounts paid for premiums on insurance of which his company had issued at different times large amounts as surety for petitioner, but he was unable to specify the policies on which such premiums had been charged. He was emphatic in his denial that he had ever owed a note of $6,000 or of any amount to the Scandinavian American Bank and denied that he, individually, had ever done business with that bank. Petitioner then placed on the stand the former note teller and former cashier of the Scandinavian American Bank, which is now defunct. The former note teller identified the note teller's blotter above referred to and certain notations on the back of the certificate of deposit, which he stated were made by him at the oral instruction of the cashier. He stated that the entry in the note teller's blotter and the notations on the back of the certificate of deposit indicated that of the total deposit of $15,000 the sum of $6,000 was used to pay a note of George W. Allen, but that he had no distinct recollection of the matter and that he did not know whether the George W. Allen, on whose note the credit was made, was the same George W. Allen who petitioner charges received the amount. The former teller was even more uncertain as to what took place. He testified as follows with reference to the entries on the note teller's blotter:

Q. And so far as you now know you have no recollection that is not a correct entry of the disposition of these funds?
A. I have no recollection of the transaction.
 By the Member:
Q. Do you know if the bank had a note of Mr. Allen of $6,000?
A. I do not recall.
Q. Do you know whether you had any note of Mr. Allen?
A. He was not a customer at the bank, and he did a lot of business for his company with the bank.
Q. You do not know if that $6,000 entry there was true or not?
A. No.
Q. You would not know if the distribution on the back of that certificate of deposit was true or not true, would you?
A. No.

With reference to the $6,000 credit, petitioner testified:

 By the Member:
Q. What do you know about this $6,000 item?
A. I know I never got it.

Q. You know you never got it?
A. Yes.
Q. Do you know who got it?
A. No.
Q. Do you know if Mr. Allen got any of it?
A. No.
Q. Do you know anything about the note he had at the bank?
A. No, sir.
Q. Did any man at the bank ever tell you about it, anything you know about Mr. Allen receiving a penny?
A. Not of that $6,000.

Thus the evidence discloses that the very man to whom petitioner testified he paid or caused to be paid the sum of $8,000 for his services, denies that he was paid that or any other amount therefor. Neither officer of the bank is able to recall anything about Allen's alleged note. What connection, if any, petitioner had with such note is unexplained; in fact, petitioner admits he does not know whether Allen received any part of the credit of $6,000. It is not explained why it was necessary, in order to pay the sum of $2,000, to draw three separate checks on the same day on the same bank to two payees. When we add to this the claim of petitioner that he paid Allen over one-half the amount recovered solely for the use by Allen of his friendly relations with the officers of the Highway Department, we can not say the respondent erred in denying this particular deduction.

III. The only question submitted to the Board with respect to the loss by reason of the sale of stock in the Coast Steel Machinery Co. is whether such loss was sustained in the year 1921, when the stock was sold by Boyer, trustee, or in the year 1922, when petitioner sustained his loss under his building contract with the City of Portland. The facts relating to this issue consist of a stipulation of the parties and certain exhibits filed therewith. The stipulation does not disclose exactly what was the nature of the contractual relation between petitioner and Boyer, trustee, with reference to this stock. At one place it is stated that the stock was " put up " by petitioner with the trustee and in another place that petitioner " turned over " the stock to the trustee. However, we are aided by the brief filed for respondent, who was a party to the stipulation. It is there stated, " In the year 1917 the petitioner, Hans Pederson, transferred 180 shares of said stock to one J. C. Boyer, trustee, for the Creditor's Committee for the Civic Auditorium of Portland, Oregon, as collateral under a contract which petitioner Hans Pederson had for the construction of a part of said building ". Thus it is disclosed that the stock was " put up " or " turned over " as "col-

lateral." The title to the stock therefore remained in petitioner, and when the sale was made it was petitioner's stock that was sold. If the stock had never been pledged but petitioner had sold it and applied the proceeds to this building contract, we do not think it would be contended that his loss did not occur in the year the sale was made. The fact that the sale was made by the pledgee does not alter the case. The loss by reason of the sale of the stock and the loss arising out of the construction contract were losses incurred in distinct and different transactions. Petitioner is entitled to the deduction of this loss from his gross income for the year 1921. Petitioner's loss in 1921 with respect to the sale of this stock is the difference between the cost of the 180 shares pledged and the sale price.

IV and V. Petitioner in his return for 1920 sought to deduct from his gross income for that year the amount of $169,137.65 as a loss on his National Realty Co. mortgage and the further sum of $20,000 as a loss on his stock in the same corporation. Respondent determined that these losses were not sustained during the year 1920 but were sustained in the year 1916 and, further, that the loss on the mortgage amounted to $93,000 instead of $169,137.65. Petitioner now assents to the determination as to the amount of his loss on the mortgage but asserts in this proceeding that both the losses on the mortgage and on the stock were sustained in the year 1918 and seeks to have the Board determine that such losses were sustained in the latter year.

Petitioner in his return for the year 1921 sought to deduct the amount of $71,912.45, representing moneys advanced by him to the Hans Pederson Construction Co., and lost by that company on the Raymond contract. Respondent determined that the loss, if any, was not sustained in the year 1921, and disallowed the deduction. Petitioner asserts in this proceeding that the loss was incurred in the year 1918 and requests the Board to so determine.

It will be perceived from the above that petitioner does not contend that respondent erred in determining that any of the above deductions should not be taken in the respective years in which petitioner in his returns sought to deduct them. All that he asks is that the Board determine that they are deductible from his gross income for the year 1918.

The record discloses that respondent has not only determined no deficiency for the year 1918, but has here determined that petitioner sustained in that year a loss of $315.43 and was liable for no tax whatsoever. No question of overassessment is presented. The sole pertinent fact is that no tax whatever has been determined and

therefore no deficiency, as that term is used in the Revenue Acts, has been determined. The question presented is whether the Board possesses jurisdiction to make the determination requested by petitioner.

The jurisdiction conferred upon the Board by section 274 of the Revenue Act of 1926 to redetermine a deficiency is limited by subdivision (g) of the same section. This subdivision reads:

> The Board in redetermining a deficiency in respect of any taxable year shall consider such facts with relation to the taxes for other taxable years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other taxable year has been overpaid or underpaid.

It is clear that under the above provision the Board is without jurisdiction to determine petitioner's tax liability for the year 1918 for the reason that no deficiency has been determined by respondent for that year. Such is not only the clear meaning of the subdivision, but has been the constant holding of the Board since its decisions in *R. P. Hazzard Co.*, 4 B. T. A. 150, and *Cornelius Cotton Mills*, 4 B. T. A. 255. Cf. *William C. Shanley, Jr.*, 7 B. T. A. 521, affirmed per curiam by the Circuit Court of Appeals in the Second Circuit on October 15, 1928, 28 Fed. (2d) 1018.

The only remaining question is, Would the redetermination of the issues pressed by petitioner with reference to the calendar year 1918 have any effect on his tax liability for the years over which the Board has jurisdiction, to wit, the calendar years 1920 and 1921. There has been no overpayment of taxes for the year 1918, since no taxes whatever have been paid, and, therefore, there is no overpayment to be credited on taxes for 1920 and 1921. Even if such overpayment had been made, we would not, as above pointed out, possess jurisdiction to make such redetermination. See *Cornelius Cotton Mills, supra.* Neither could we determine that petitioner suffered a " net loss," as that term is defined in section 204 of the Revenue Act of 1918, for the calendar year 1918, for the reason that the only period for which such net loss may be determined is " for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, * * *." See *Butler's Warehouses, Inc.*, 1 B. T. A. 851; *Ennis-Brown Co.*, 10 B. T. A. 1248. These are the only factors with reference to the calendar year 1918 which would have any bearing on petitioner's tax liability for the years 1920 and 1921.

Petitioner makes no complaint as to respondent's determinations for the calendar year 1919, in which respondent determined that petitioner suffered a net loss. For the above reasons these appeals, in so far as they relate to the calendar years 1918 and 1919, are dis-

missed. Since we reach the above conclusion we do not deem it necessary or proper to determine the amount or the nature of these deductions.

VI. With respect to the determination of respondent of a negligence penalty, while it is no doubt true that petitioner made mistakes in his interpretations of the law as concerns his taxable income for the years in question, yet when we consider the extensive business interests of petitioner and the complexities with which they were surrounded, we can not say that the returns were negligently filed. The books of petitioner, together with their supporting data, record no intentional omissions. Neither petitioner nor his bookkeeper were versed in the income-tax laws and the errors were made in good faith The respondent was in error in his imposition of the negligence penalty.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*